Zacharias v. Stanford International Bank Christopher King v. Barbara Plaintiffs Do process clause comes into play here and protects our claim? Well, I thought that the very concept of a receiver was that the receiver would be, in effect, takes, stands in place of the corporate entity, whatever, and then they set about to, the receiver is charged with responsibility of then seeking reimbursement or compensation for the injuries that were inflicted upon the corporate entity, in essence. That is, to enforce the obligations that the company wrongfully undertook to perform. In other words, this whole operation is that the people were promised that they would be paid interest on their money and their money would be returned to them there. There's a failure of that. The receiver sues to enforce those obligations. As I read this complaint, these complaints against these two insurers over here on the side basically charge a joinder participation in an ongoing conspiracy. They're the same charges. So my question to you, if it is the case that it seems, appears to be, that your clients are asserting exactly the same claims that have been asserted by the receiver, that is, this ongoing conspiracy of Ponzi scheme. Keep in mind that a Ponzi scheme is not a single act. It is an aggregation of a bunch of things coming together, one of which was the allegations of the complaint, as I read them, is that these particular insurance letters were delivered in a way that furthered the ongoing conspiracy. So do you maintain that your claims are not the same claims that have been brought before? Yes, Judge. That's our claim. But one other thing. The heart of your claim, if it is the case that they're the same basic charges, then how can you proceed without completely pulling down the entire receivership process? Because the claims are not the same. They're very different. And I would answer the first part of your statement by— Well, that's not what your complaint says. Well, Judge, if we compare our complaint, which is the complaint of investors, we are suing Willis for making misrepresentations and frauding us and inducing us into taking our investment dollars and putting them into the Stanford CDs. Our claims are for negligent misrepresentation and fraud. The receiver is not bringing any claims like that. If we look carefully at the receivership complaint, what they're suing for are claims for fraudulent transfer to claw back proceeds or premiums that they pay. It has nothing whatsoever to do with us. And they're also suing for breach of fiduciary duty under this nebulous theory that the insolvency of the Stanford entities was deepened. Now, we don't have any claim that Willis owed us— Well, let me get down to something a little more concrete. I'm looking at page 26 of the complaint. Defendants aided and abetted and assisted Stanford Financial to create and perpetuate the myth that the investments in SIB were insured. Defendants assisted this segment of Stanford's fraud by creating and distributing the insurance endorsement letters described herein, etc. That sounds to me like a joinder of the ongoing conspiracy. Well, our claims are pretty straightforward, which is Willis gave us these letters, these comfort letters that contain material misrepresentations. There is a distinction that courts have recognized between a situation where a person is defrauded, an investor is defrauded and induced into giving their investment dollars over to the Ponzi schemers versus what happens to those dollars once they're actually in the receivership entities. And the Ponzi schemers do their thing, and all that money disappears. But your clients suffered the same injury or were injured by the Ponzi scheme, correct? Our clients— Or not. Yes or no? Yes, we were. Okay. It is aiding and abetting fraud, but at inception, we were injured by Willis's misrepresentations. Well, the whole—yes, there are misrepresentations, but there are misrepresentations which were in furtherance of an ongoing Ponzi scheme. My difficulty with your entire argument is if you accept that, you are going to really pull the rug out from every receivership. What this sounds an awful lot like to me is the old class action game coming in after the bill is put together to hold up for additional claims. You participated fully, and your clients did, in this ongoing gathering by the receiver. Is that correct up until this time? But— Right? It is not correct. Our claim has always been directed solely to Willis, and they're the only defendants in this case. And it goes to an essential fact that I think distinguished this case from any other case— Okay. —that distinguished this case from any other case where a bar order this broad has been allowed, which is we go to the essential concept of what a receiver can do. A receiver can manage the property of the receivership entities. It does not have standing, and it is the law of this case that a receiver does not have standing to bring the claims of the investors. The investor claims are ours. And when we're talking about a misrepresentation, this was a misrepresentation by Willis. No, but they have the standing to bring the claims of the corporate entity and to basically bring back those proceeds that were extracted from it for the benefit of the — who are they? The investors. And what you're trying to do is to separate yourself from those investors because — but yet you're piggybacked on the entire receivership process. But if every member of the — you could not maintain a receivership where people can play this game, because unless you don't — you can disagree with me, but my assertion, and I put it out there for you, that's what the receivership is all about. And they are basically enforcing the obligations that the corporate entity that they — whose shoes they step into, enforcing those obligations, which is to pay those — the money that should have been paid to the investors. And that's the whole claim. And as I read your complaint, you're saying exactly the same thing. You call it fiduciary, whatever else. Now, where is the difference? Well, I agree with what you're saying, which is the receiver has standing to sue for injuries to the receivership estate. Where I'd push back with you, Judge Higginbottom, is the notion that that's what we're suing for. These are not injuries to the receivership estate. Of course, the receiver has the ability to bring these claims — They are injuries suffered by virtue of the Ponzi scheme, which caused the nonpayment of all of these CDs, et cetera. And if those CDs had been paid, then you would have — you would be reimbursed, too, right through the claim process. But that does not preclude an action by the investors against the third party. And I think that's where — what distinguishes this case is we seek to be made whole by Willis Dollars. We seek to hold Willis responsible for their participation in this fraud. It is not an injury to any of the Stanford entities that Willis came and made misrepresentations to us and induced us or my clients to put this — to put our investment dollars into the scheme. You're right. Well, what do you say about that? Well, the Janford complaint is exactly the opposite of what you're saying. It's that Willis put an intentionally known, respected brand name behind Stanford, et cetera, et cetera. And it goes on to say they're part of a fraudulent scheme to make the investor believe the letters were being sent in a personalized manner, et cetera, et cetera. So in other words, I guess I'm having real difficulty with seeing that your claim is not — is different in a material way from what the receiver has brought and managed to date. And that's the up and down of this. Well, Judge, I would point out the cases that have drawn the distinction. And if we look at, for example, the de Young case, the de Young case spends a lot of time distinguishing the Liberty case from the Sixth Circuit. And they draw the distinction that I've been trying to get across here, which is that when you have — and it derives from a Seventh Circuit case, that it is a different story when you have a third party defrauding an investor to give money into the estate versus — I don't read Judge Posner's language quite that way, with all respect. And I'll direct you to Judge Seymour's opinion of the Tenth Circuit. What do you do with that? It dresses hell on the bar, which is what you're talking about. The de Young case, I think, is distinguishable in a lot of different ways. For one, you know, there was a limited pool of assets. For another, the Court found that there were intertwined claims. And our position is these are not intertwined claims. In fact, in de Young, there weren't even any claims by investors. They just said, hey, if anyone can sue — But if your claims are intertwined, can you prevail? Well, I think that we can because of — We believe we can because of the standing — Even though they're the same? Because of the existing case law from this court, from the Fifth Circuit, about the standing of the receiver to bring claims that belong to the investors. He does not have standing, and there was no party before Judge Godbee who was the real party in interest to our investor claims. And there was nobody in that case who represented us. And it goes back to a fundamental due process principle, which is that it is a violation. It's an infringement of due process. With all respect, I think that back to the question, if you're wholly different and separate and so forth, you've got due process concerns. But if you go back to my initial premise that you rise or fall on the question of whether or not you are meaningfully asserting different claims, you have an overall conspiracy theory, Ponzi scheme put forward by the receiver, and you have a — and they are simply entitled, as I read the law, to recover those monies that were — that were from the nonperformance of the entity to which they seceded. And you have here — they've also sued as part of that same package, these two insurance companies and brokerage companies, and gone forward with that. And your clients have participated through all these other claims, but now that they've cut a deal with those two people, you want to come back and to file another lawsuit against them because you think one of them has got deeper pockets. Well, the problem is that any claim that we bring against Willis isn't going to affect the receivership one bit. And the other point that I would also make— Well, I thought that the agreement was that without the bar, the deal is off. Without the bar, the deal is off. But we didn't participate in that settlement. They can't dangle our claims that don't belong to the receiver and say, look how attractive this deal is to us. But where are those claims? Where is that client's money going to go? Where is that $120 million or so dollars? Where is that going to go? It's going to go to all the investors, even investors who never even heard of Willis. It's going to go to all the investors. In other words, you won't have to share that. This is what it's all about. Let's pull this off to one side for ourselves. It's not a fair settlement. It's three cents on the dollar, and some of my clients are getting zero. And I would also add to your question about, well, what if these are intertwined claims? I would point out that, you know, we would disagree very much that these are intertwined claims. But there's another issue that we haven't talked about, which is Rule 23. This was a class action settlement. There was no Rule 23 hearing. There's nothing in the law that says that members of the class action can't go forward. That's a bogus argument. I'm sorry, but maybe you've got two more judges you can persuade of that. I've lived with class actions and indelibly took too long to that. So I'm sorry. I just can't buy that argument. I see that my time is up. You're right. You're out of time. Okay. All right. Ms. Hyman. Can I please have the Court? I'm Leslie Hyman. I'm here on behalf of the Rupert parties who sued in state court in Texas. And I think you're going to hear a little bit about how federal receivership courts—I'm sorry. I'm going to address most of the Anti-Injunction Act with my remarks. Federal receivership courts and receivers have broad authority. I think you're going to hear that. But the authority is limited when a receivership court is trying to bar claims by non-receivership plaintiffs against non-receivership defendants, which is the case here. And one of the things that circumscribes that power is the Anti-Injunction Act, which turns 225 years old this year. That act embodies important principles of federalism. It has as its core a message of respect for the state courts. And while it has some exceptions, those exceptions are not to be enlarged by loose statutory construction. And in close cases where it's not entirely clear whether the Anti-Injunction Act bars the injunction in question or not, the Supreme Court tells us that, yes, the Anti-Injunction Act bars the injunction. In Shadbourne, in affirming this court's ruling that these claims did not belong in front of the receivership, the Supreme Court said the effect of its decision was to permit victims of this fraud to recover damages under state law. Surely the Supreme Court didn't think that then the receivership court was going to say, no, I changed my mind. You don't get to have your day in court under state law. The receiver also expressly agreed not to interfere with the Rupert Party's abilities to pursue their claims, and then went back on that when he got this sweet settlement deal. So what did the district court do on the Anti-Injunction Act? He said that the Anti-Injunction Act didn't prohibit the bar order. He discussed it for this and this much here, so about a page. And first what he said is that he had the power to enjoin my client's state court claims as part of his ability to effectively manage complex nationwide cases like the Stanford matter. He cited two cases for that proposition. That was an error of law because the two cases that he cited were class action cases. And what he was in those two cases, what was being enjoined was the class members were being enjoined from interfering with the class actions to which they were members. This is not a class action. We've heard that a million times. They're not settling my client's claims. My clients are not bound by a class. And so those two cases don't support what the court did. He also expressed the possibility of state court judgments in favor of individual litigants or adverse to the receivership estate has the potential to interfere with this court's judgments about receivership assets. But he made no fact findings as to how my client's claims could be adverse to the receivership estate. We're not suing the receivership estate. We're trying to get money from Willis and BNB. And he made no fact findings for how allowing the Rupert Party's claims to proceed in state court threatens the court's judgment about the receivership assets. He made no findings whatsoever in support of his conclusion. The two arguments we've heard about why this injunction is appropriate in aid of the jurisdiction is that Willis wants it and that there might be contribution and indemnity claims against the receivership estate in the future. It can't be enough that Willis wants it. This spring, Willis agreed to pay $40 million to settle a case in Houston brought by the city of Houston. So what if Willis had said, you know what, in order to settle this receivership case, I want you to bar that case in Houston brought by the firefighters? No one would think that was OK. It can't be that because Willis wants it before they give this $120 million, that answers the question. The contribution and indemnity is completely hypothetical. Right now, there are no contribution indemnity claims. And under Chapter 33 of the Texas Civil Practice and Remedy Code, we don't think there could be. But more importantly, those contribution and indemnity claims are barred by the receivership order. Willis would have to go to Judge Godbee and say, please lift the receivership stay and let me bring contribution and indemnity claims against Willis. And Judge Godbee has the power to say no. He can deal with that problem in a way that is recognized by the courts as opposed to doing this, saying your state court claims that are pending in state court and have been pending in state court for 10 years have just gone away. The district court stated exception to the Anti-Injunction Act was not applicable. He didn't make appropriate fact findings to support it. And the bar order should be vacated for that reason. All right. Thank you, counsel. Mr. Staples. May it please the court. Your Honors, my name is Sean Staples. I represent the able parties in this case, which is 316 investor appellants who have claims against the Willis defendants. And these appellants are all putative class members in the choice class action. Now, it's well settled that a class action imposes a fiduciary duty on representatives and counsel of the class to act for the benefit of the putative class members. The choice named class representatives effectively settled claims of the class, then gave those proceeds to the receiver who has no right to receive them, then requested a bar order extinguishing the claims of the putative class members whose interests they supposedly represent. And then class counsel accepts or proposes to accept a $26 million fee while disclaiming any representation of the class. How can this be anything other than the breach of the class representatives and the class counsel's duty towards the putative class members? Now, it's well established that the receiver has no right to prosecute the claims of the appellants. The receiver argues that he and the seven individual class representatives settled only their own individual claims and not the class action. How then is it that counsel is being paid $26 million contingency fee to settle seven investors claims? How is it that class counsel is being paid a percentage of the entire settlement if part of that settlement were truly attributable to the receivers damages in this case? And what are the receivership entities claims in this case that are not derivative of the investors claims? The receivers claims against Willis amounts to a clawback of the premiums that is received. The receiver has never been required to, and I'm not sure that he can, articulate a damage model for the receivership injuries in this case that has any rational relationship to this settlement. This is an improper aggregate settlement in the sense that it represents a single payment to multiple parties with conflicting interests. No one has, and no one can tell what portion of this settlement is attributable to the receivership entities, what portion is attributable to the seven main class members, what portion is attributable to the putative class members, and what portion might be attributable to the OSIC, the other party in this case. It's a complete fiction to say that the settlement payment was not made largely in exchange for the bar order. And the very fact that barring the appellant's claims is an absolute condition of settlement reinforces that conclusion. The facts and the circumstances as a whole all lead to the conclusion that the choice named class representatives settled the claims of the class, gave the proceeds to the receiver, and then requested a bar order. This constitutes a breach of their duty to the putative class, and for that reason alone, the judgment should be overturned. The receiver does not address these difficult issues in response to his brief except to justify the conflict and the breach of duty by stating that the settlement was consistent with the interests of both the receivership and the investors. But a conflict is a conflict, and a breach of duty is a breach of duty, and attempting to whitewash it by saying it benefits the receivership estate is no justification. Your Honor, my time is running out, but I would direct the court to the erroneous could impact standard that the district court used in this case to justify awarding the putative class member's settlement to the receiver. My time is up, but the could impact standard is so broad that it becomes untenable in a receivership case. Thank you, Your Honor. Thank you, counsel. Appellee, Mr. Sadler. Good afternoon, members of the court. I'm Kevin Sadler. I represent Mr. Ralph. Can we receive it? I'll be speaking first, followed by Mr. Young, who represents the other parties to the settlement. Judge Higginbotham, you really did hit to the core of this. Let me start just with a little bit of context to clear up the confusion. The claims that the receiver is pursuing fraud, negligence, conspiracy, aiding and abetting, same kinds of causes of action that these objectors are pursuing. It's no accident because the receiver is trying to recoup money to pay off C.D. losses, and the objectors want to sue for C.D. losses. That's all we're talking about here is C.D. losses. They're not claiming that Willis ran over them with its car in their parking lot. This is all about C.D. losses. So it is. It's exactly the same thing. Why does that matter here? Well, it matters for a couple of different reasons. First of all, this settlement, $100 million plus after attorney's fees, goes to all the C.D. victims, including the people they represent. They're going to get their pro rata share. The trouble is they're coming to you, as I think your questions elicited. They want something more than pro rata, and there's a problem with that because it is the law in this circuit, every other circuit, that Ponzi scheme victims share compensation pro rata. They want pro rata plus. There is no case that says they're entitled to pro rata plus, and there's also no case that says they can run off and have their own private little lawsuit, which will interfere with what the receiver is doing. So they're getting just compensation out of their settlement. They simply want more. The second point to this is why do we even have receivers step in when there's a Ponzi scheme? We don't have to. We could just let everybody sue everybody, and it would be total anarchy, and whoever got to the court first, whoever got to this defendant, that defendant would get the most money. But the law established this long ago. We're not the first receivership in a Ponzi scheme. We're not inventing new law here. These objectors, and I was curious that this was not mentioned, but the Rupert objectors, their claims are currently stayed under injunction issued by Judge Godbee in this receivership affirmed by the Fifth Circuit. They're currently enjoined from prosecuting their claims. That's the whole point here. Since the Wienke case in 1981, it has been recognized as a matter of federal receivership law that if a receivership court needs to stop some third party from pursuing litigation because it interferes with the receivers in the receivership court's work, he has the power to do that. Every circuit has decided that. Two panels of this circuit have decided that, including in appeals out of this very receivership. So this is not novel, the idea that Judge Godbee can reach out and say your state court litigation over here or your private arbitration, both of those have come up, interferes with what I need the receiver to do, which is gather as much money as he can from as many people as he can who aided and abetted this Ponzi scheme and give it to the victims. So we are long since past the idea that a federal receivership court lacks the power to enjoin litigation. That is absolutely established law. Their real complaint is not about this power question. It's they just don't like the settlement because they want more money. Well, you have a power question, which we've already passed. Now we're talking about abuse of discretion. And that gets back to the Dionne case, which is the closest case that I know of, almost on all fours, three and a half to this. No case is going to be exactly like ours, thank God. Stanford's Ponzi scheme is either the worst or the second worst in the history of the United States, depending upon if you count by dollar losses or victims. But the Dionne case shows us that. Ponzi scheme itself was pretty bad. Well, Your Honor, we had almost 18,000 victims and five billion in losses. I know. So far, and this is in the record, through litigation and again, let's be clear about this. Most of the time this is true. It was true with Stanford. By the time the receiver is appointed, most of the money is gone. The only way you get it for the victims is you go find responsible people and you sue them. And making money by suing people is not the easiest or fastest way to recover losses, but it's the only tool the receiver has. And that's why settlements like this are so critical. We have been authorized so far in this receivership and have been distributing over $200 million, most of which we've collected from other litigation, money which goes to everyone, including these objectors. So now we have $100 million plus, 50 percent on top of what we've already done, and we are ready. We've been ready to distribute it to the victims literally for years. We filed a motion to approve the settlement in September 2016, and the victims have been waiting. And the reason that's relevant here, because under the abuse of discretion standard, that is one of the factors Judge Godbee absolutely considered and had to consider. He is the one judge balancing these competing interests. And again, we could go back to we don't need a receiver, let's just all have at it, or we could do it the way we've been doing it, which we have one judge, one receiver, and their job is to get as much money back to the victims and balance these competing interests because there's never enough money to go around. And if you look at Judge Godbee's order, he carefully went through all the factors very similar to the DeYoung case. I've got $100 million now ready to go to the victims. Or we could just litigate till kingdom come, and maybe at the end of that litigation, the receiver might win, he might win more, he might win less, but it's going to be years. One of these defendants has an eroding insurance policy, just as was the case in the DeYoung situation. So the longer we litigate against that defendant, the less money there is to pay to the victims. The receiver's job, along with the court, is to balance these competing interests, and that is why it is completely within the judge's very wide strike zone of discretion to say yes to a settlement like this. Your Honors, it's not a matter of what Willis wants. The judge had to approve it. The receiver had to agree to it. This isn't something that Mr. Janvey and Willis could go off in a corner and just sort of cook up themselves and say it's a done deal. We had a receivership court with ten years of experience with this giant mess approve this after careful, careful consideration. So back to what this appeal is really about. It's not about the power question. This receivership court has the power to enjoin third-party litigation. That is absolutely clearly established. Now the only real question, and I don't think it's a hard question, is was this an abuse of discretion to approve this settlement under these circumstances? And when you take all of the factors that Judge Godbee considered, $100 million available now to the victims, they're going to share in it pro rata. If we wait, who knows whether it will be more or less or when it will ever come. I mean just look at the history of this litigation. The receiver's lawsuit was filed in 2013. The motion to approve settlement 2016. I'm here arguing to you in 2018. I mean it is no secret that litigation takes a long time, and so it is very, very appropriate for Judge Godbee to say I can get $100 million to the victims now versus who knows in the future. And yes, the receiver believes he has a strong case against Willis and B&B. Obviously Willis and B&B thought it was something more than frivolous to pay $130-odd million. But the idea that we're just not going to approve this settlement, we're just going to litigate everything to the end, that is just so contrary to fairness and common sense because none of us has a crystal ball. They may think they have wonderful claims. Maybe they do. Maybe they don't. But why would we jeopardize $100 million to all the victims now to see if they've got the magic swing that they can hit it out of the park for $200 million or $300 million ten years from now? I'm reminded of something I was told when I was a very young lawyer that I now know to be a fact, which is if you haven't tried cases and lost that you should have won and won cases you should have lost, you haven't tried very many cases. And so the idea that we're just going to spin the wheel, that is not a fair overriding interest to all the other factors. And so I would submit to you this is a very straightforward opinion for you to write. Judd Godbee has the power. This is clearly well within his strike zone of discretion to approve this settlement. I'd be happy to answer any other questions or questions. Thank you. Thank you, Counsel. Mr. Young. May it please the Court, Michael Young representing the official Stanford Investors Committee and the individual choice plaintiffs. Mr. Sadler has addressed the propriety of the bar orders and calls to me to address the district court's exercise of discretion in approving this settlement. To do that, I need to kind of discuss the cast of characters. We have, of course, the receiver who has succeeded to the interest of the Stanford entities and, as opposing counsel has pointed out, does not directly have standing to pursue investor claims. But what is the receiver pursuing? The receiver is already on the adverse end of a summary judgment in favor of the Securities and Exchange Commission for the money that was built from the Stanford investors. He could, if Mr. Stanford had any money left, turn to Mr. Stanford and sue him and say, look at the trouble you got me, the receiver, and my estate into. I want the $5 billion from you. Mr. Stanford, unfortunately, doesn't have it anymore. But the receiver could also sue those who aided and abetted in Stanford's Ponzi scheme and say, you helped him, I'm left holding the bag, and so you owe for that liability. Even though the receiver reaches that liability and that recovery by a different path than the investors would reach it, it is in fact the same destination. The investors are saying we were defrauded and the receivership owes us as well as those who aided and abetted Stanford's fraud. The receiver is saying the same thing from a different direction. You aided Stanford, therefore you have subjected me to liability. The official Stanford Investors Committee is the assignee of the receiver in pursuing the receiver's claims in this case. I mentioned that we represent both the OSIC and the individual choice plaintiffs. Counsel is simply in error in claiming that an attorney's fee was awarded for services as class counsel. No class was ever certified. Our fee does not come from the district court's Rule 23 discretion. It comes from a contingency fee agreement with the receiver to act as counsel for OSIC in pursuing these claims pursuant to the receiver's assignment. Now there might be some sort of conflict of interest if in fact the receiver was acting in this connection for a different group of creditors than OSIC or the choice plaintiffs were acting. The receiver, after all, has not only all of the investor claimants to deal with but has other trade creditors and so forth. But from the inception of the third-party recoveries in this case, from the inception of all of the distributions in this case, the district court has directed with the receiver's acquiescence that the money recovered by the receiver be paid specifically to the investor claimants. And so when the claim is leveled of collusion in these settlements, what the objectors are saying is that the receiver, who is receiving money for the investor claimants, OSIC, which exists to prosecute the claims to obtain recovery for the investor claimants, and the choice plaintiffs who are suing on behalf of a putative class of the very same investor plaintiffs, somehow have a conflict of interest even though they're benefiting exactly the same group of recipients. Now any settlement involves trading with the enemy, and so in that sense, if you want to assign the label of collusion to it, you're really not saying very much. But there was no collusion among the parties representing the investor claimants and obtaining recovery on their behalf, and so the charges that somehow somebody was betrayed fall flat. Turning to the amount of the settlement, $132 million pales in comparison to the total defrauded by Allen Stanford. That's an absolute fact. But the fact of the matter is that there are a lot of things that can happen between a suit for the entirety of that amount and an actual recoverable, collectible judgment for that amount. In the case of BMB, one of the big things that could happen is you can get a big judgment against BMB, and BMB does not have the assets to pay. The record reflects a wasting insurance policy with roughly $13 million left available, few if any other assets to satisfy a judgment. So that's all there is. With respect to Willis, Willis has greater resources than that, but has a lot of defenses that have yet to be tested in the crucible of summary judgment and trial. We have in large part survived Rule 12b-6 motions to dismiss, but in several instances the district court identified factual issues and said we'll revisit this at the summary judgment stage. We haven't reached that stage yet. We have issues of whether a class will be certified. Many of the defenses that were rejected at the Rule 12b-6 issues are not going away, either at the trial court level or in an eventual appeal. So just as any settlement is an exercise in weighing of risks and rewards, both in terms of the risk of ultimate success and in terms of the timing, we believe the district court acted well within its discretion in approving the settlement. Unless the court has any questions, that concludes my argument. All right. Thank you, Counsel. Rebuttal, Mr. King. Mr. Judge, thank you. I want to start with the statements from Mr. Sadler. One thing that was missing, or I should start with what was missing, which was any discussion of standing. And in order for our decision here in this case to be consistent with other decisions by the Fifth Circuit, it's a question that needs to be discussed. And what seems to me he's arguing is that he should be given standing. The receiver should have standing to bring investor claims because it's a way to enrich the receivership. But that's not what this court has already decided. He does not have the ability to bring claims of investors. When he tells you we're suing for C.D. losses and the investors are suing for C.D. losses, that's not correct. Only we are suing for C.D. losses. The C.D. losses were not an injury to the receivership estate. What the injury was to the receivership estate, if you look closely at their complaint, was Allen Stanford absconding with $1.8 billion in assets. That's something they can go get. That's something that they could hold Willis responsible for. But they don't have the standing to bring the claims that we have against Willis. And standing goes hand in hand with Article III case for controversy requirements. And other courts have made that connection. He said this case is just like DeYoung. No, it's not. In DeYoung, the court didn't just say, hey, these cases have a common nucleus of facts. The court said the investor claims, if there were to be any, would be identical. These aren't identical claims. Is there a distinction to be made between a district court's jurisdiction to stay investors' claims, which this court has upheld, from its jurisdiction to bar them outright? Yes, and that's a good question because you talked about the last appeal. The last appeal, we brought an appeal, and it was dismissed because there was no final order. There was a ruling, and the whole concept there was this was a temporary stay. It wasn't a permanent extinguishment of the investor claims. And so what happened in the last appeal didn't decide anything. But what happened in the Janvey v. Democratic senatorial case and the Janvey v. Aguirre case has a huge impact on this, which is he doesn't – it is the law of this case. The receiver can't sue for investor claims, period. And if there is no standing to bring these claims by the receiver, then what is the case for controversy? What is the subject matter jurisdiction for the district court to then come in and say I'm going to take these claims away from the investors and give them to the receiver to settle? The whole argument is that this is a great deal for the receivership. That may be the case, but it's not his claims to settle. And to your question about the specific issues that you asked me or the specific allegations from the complaint, you just can't compare two complaints if the receiver is trying to bring claims he doesn't own. And that's the bottom line here. It goes beyond just a question of what is the benefit to the receiver. If that were the only consideration, the receiver could stay or terminate any kind of claims against a third party, no matter whether they had any relationship with Stanford or not. Let me clarify one thing about your jurisdiction argument. Is it your contention the district court lacked jurisdiction to bar investor claims that were pending in federal court or only in state court? In both. In both. And I would say that the case that is on point isn't the Young. It's the Liberty case. And it is the Gelderman case from the 10th Circuit that talked about the inability of receivers to sort of generate or sweeten the pot of a settlement and to base their ability to get these by talking about what good faith it was and how well they did. If there's no jurisdiction, those issues don't go away. We'd ask the court to reverse the bar. Thank you, counsel. We'll take this matter under advisement.